**UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**PITTSBURGH DIVISION**

**Caitlin McCreary,**
Plaintiff

v.

**PNC Bank N.A.,**
Defendant

Civil Action – Complaint

Case No. 2:26-cv-00800-MRH

**FILED**

JUN - 2 2026

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

# FIRST AMENDED COMPLAINT

Plaintiff Caitlin McCreary, proceeding pro se, alleges as follows:

# I. PARTIES

1. Plaintiff, Caitlin McCreary, is an adult individual residing in Allegheny County, Pennsylvania.
2. Plaintiff is an African American woman and a member of protected classes under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.
3. Defendant, PNC Bank, N.A., is a financial services corporation with its principal place of business in Pittsburgh, Pennsylvania.
4. At all relevant times, Defendant acted through its employees and agents, including:
   a. Justin Crowe (white male), Plaintiff's direct supervisor, located in Erie, Pennsylvania
   b. Michael Jack (white male), Program Manager working directly with Plaintiff
   c. Todd Ketterling (white male), Fraud Director
   d. Becky Walters (white female), Program Manager
   e. Marley Hartzell (white female), Project Manager
   f. Shane [Last Name Unknown] (white male), Project Administrator
   g. Thomas Heckroth (white male), Project Manager I

# II. JURISDICTION AND VENUE

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

6. Venue is proper in this district because the events giving rise to this action occurred in Allegheny County, Pennsylvania.

# III. FACTUAL ALLEGATIONS

## A. Employment Background

7. Plaintiff began employment with Defendant on or about November 12, 2024, as a Project Manager II within the Fraud Portfolio.

8. Plaintiff holds both a Bachelor's Degree and Master's Degree in Business Administration and has over eight years of professional experience in financial services, technology, consulting, project management, and program delivery.

9. Plaintiff is ALD-certified in Lean Six Sigma Green Belt, demonstrating formal training in process improvement, operational efficiency, organizational change management, and project execution.

10. Prior to joining Defendant, Plaintiff held positions including Project Manager I, Lead Project Manager, Technical Project Manager, Scrum Master, and Managing Consultant supporting clients within the Banking and Capital Markets sector.

11. Throughout her career, Plaintiff successfully managed complex projects involving engineering teams, data teams, executive stakeholders, business partners, regulatory initiatives, and enterprise-wide implementations.

12. Prior to her employment with Defendant, Plaintiff had never been terminated from any position and had no history of performance-related discipline.

13. Plaintiff's prior layoff from a consulting firm was fully disclosed during Defendant's interview and hiring process.

14. Defendant nevertheless selected Plaintiff for the Project Manager II position after reviewing her educational background, employment history, professional qualifications, and project management experience.

15. Upon information and belief, Plaintiff was interviewed by Justin Crowe (white male) and Olivia Heckroth (white female) during the hiring process.

16. On or about December 2, 2024, during Plaintiff's first in-person team event, Fraud Director Todd Ketterling (white male) stated words to the effect that Plaintiff came "highly spoken of" by both Justin Crowe and Olivia Heckroth following her interview process.

17. During the same conversation, Olivia Heckroth stated words to the effect that she had contacted Justin Crowe immediately following Plaintiff's interview and stated that if Defendant did not hire Plaintiff, it would be a mistake.

18. Plaintiff was assigned to work on the NRT-Fraud Project, a high-priority initiative within Defendant's Fraud Portfolio that, upon information and belief, carried an anticipated budget of approximately $14 million.

19. The NRT-Fraud Project had been initiated prior to Plaintiff's hire, in or around late 2023 or 2024, but remained significantly underdeveloped at the time Plaintiff joined.

20. Upon joining the project, Plaintiff observed that the project was not adequately staffed and lacked sufficient organizational structure, resulting in substantial delays, uncertainty

regarding project ownership, resource shortages, and repeated escalation discussions involving senior leadership.

21. The project lacked key personnel necessary to advance project work, including technical resources and a dedicated Scrum Master, and these staffing deficiencies were repeatedly discussed by project stakeholders and leadership.

22. The project environment required frequent meetings with executive leadership to determine how to initiate, stabilize, and advance the project due to these deficiencies.

23. At the time of Plaintiff's termination, the NRT-Fraud Project had incurred only approximately $60,000 to $80,000 in project-related costs, reflecting that the project remained in its early stages and had not meaningfully progressed toward implementation.

24. Plaintiff's role required coordination across both the Fraud and Data teams, including:

a. Fraud Team: Plaintiff (Project Manager II) and Michael Jack (white male, Program Manager);

b. Data Team: Becky Walters (white female), Marley Hartzell (white female), Shane (white male), and Thomas Heckroth (white male).

25. Plaintiff was the only African American employee assigned to the project team. All other identified members of the project team were white.

26. During the initial period of her employment, Plaintiff was simultaneously expected to complete onboarding requirements, mandatory training courses, and project-specific training while also contributing to a high-priority project that lacked sufficient staffing, resources, and organizational structure.

27. As a result, Plaintiff's ability to fully integrate into the role was impacted by the lack of structured onboarding, combined with the demands of a project that had not yet been properly established prior to her assignment.

28. Despite these circumstances, Plaintiff actively sought opportunities to contribute to the project, repeatedly requested additional visibility into project work, sought clarification regarding responsibilities and resource allocation, volunteered to assist with Scrum Master responsibilities based on her prior experience, and consistently attempted to contribute to the success of the project.

## B. Early Employment and Initial Interactions

29. In October 2024, during the hiring process, Plaintiff was interviewed by Justin Crowe (white male), who later became her direct supervisor, and Olivia Heckroth (white female).

30. Both Justin Crowe and Olivia Heckroth participated in evaluating Plaintiff's qualifications and approving her for hire.

31. On December 2, 2024, Plaintiff met team members in person for the first time at a volunteer event.

32. At that time, Todd Ketterling stated that Plaintiff was "highly spoken of," from both Justin Crowe and Olivia Heckroth stated that hiring Plaintiff was strongly recommended.

33. Despite this positive initial feedback and Defendant's decision to hire Plaintiff following interviews with Justin Crowe and Olivia Heckroth, Plaintiff's treatment changed shortly thereafter.

## C. Disparate Treatment and Undermining Conduct

34. Throughout Plaintiff's employment, she remained in onboarding and training while simultaneously being assigned to the NRT-Fraud Project.

35. Despite the project's size, complexity, and lack of staffing, Plaintiff was expected to contribute meaningfully without being provided sufficient training, resources, or clarity regarding her role and responsibilities.

36. The NRT-Fraud Project experienced significant delays due to lack of staffing, lack of assigned resources, and coordination challenges, resulting in repeated escalation meetings involving executive leadership regarding how to move the project forward.

37. Plaintiff repeatedly raised concerns regarding the lack of resources, unclear expectations, and inability to effectively perform under these conditions.

38. These concerns were not meaningfully addressed by Defendant.

39. Plaintiff was nevertheless evaluated and treated as though she was underperforming despite being assigned to an understaffed project that lacked the personnel, structure, and resources necessary for meaningful progress.

40. Beginning in December 2024 and continuing through January 2025, Michael Jack (white male), a Program Manager working directly with Plaintiff, repeatedly spoke to Plaintiff in a dismissive and condescending manner and frequently treated Plaintiff as though she lacked the knowledge, experience, or ability to perform basic project management functions.

41. Plaintiff found this treatment particularly concerning given her educational background, professional qualifications, and more than eight years of experience in financial services and project management.

42. During this period, Michael Jack routinely failed to provide Plaintiff with visibility into project activities, staffing discussions, planning efforts, and work that fell within Plaintiff's area of responsibility. Plaintiff repeatedly sought information regarding project ownership, resource planning, project deliverables, and next steps but was frequently left without the information necessary to effectively perform assigned duties.

43. Michael Jack also assigned tasks to Plaintiff without providing the context, documentation, background information, or project knowledge necessary to successfully complete those assignments. On multiple occasions, Plaintiff was expected to participate in or lead meetings involving project work for which Michael Jack possessed relevant information but failed to share it with Plaintiff beforehand.

44. As described more fully herein, Michael Jack provided critical project information only after meetings had already begun, failed to keep Plaintiff informed of project-related activities, and created barriers that limited Plaintiff's ability to obtain visibility into work being performed on the project.

45. Plaintiff further experienced excessive scrutiny and micromanagement from Michael Jack. Rather than allowing Plaintiff to perform the responsibilities associated with her role as a Project Manager II, Michael Jack frequently questioned Plaintiff's judgment, second-guessed her decisions, and treated Plaintiff as though she lacked basic project management competence despite her prior experience and qualifications.

46. The cumulative effect of Michael Jack's conduct created a working environment that Plaintiff reasonably perceived as hostile, exclusionary, and designed to undermine her ability to succeed in her position.

47. Rather than addressing Plaintiff's concerns regarding Michael Jack's conduct, Justin Crowe (white male), Plaintiff's direct supervisor, reinforced and further enabled the same treatment by dismissing Plaintiff's concerns, failing to provide meaningful support, questioning Plaintiff's capabilities, and refusing to meaningfully address the lack of visibility, lack of resources, and hostile working conditions that Plaintiff repeatedly reported.

48. Plaintiff repeatedly attempted to obtain guidance, visibility into project work, and clarification regarding her responsibilities. Instead of receiving meaningful support, Plaintiff's concerns were minimized, redirected, or left unresolved by both Michael Jack and Justin Crowe.

49. On or about January 7, 2025, Plaintiff scheduled a one-on-one meeting with John Kirvanek (white male), a Project Manager within the Fraud organization who had previously worked with Michael Jack on other projects.

50. Plaintiff sought guidance from Mr. Kirvanek in an effort to better understand how Project Managers and Program Managers typically worked together within Defendant's organization.

51. Plaintiff specifically asked Mr. Kirvanek for advice regarding how to effectively work with Michael Jack and how to obtain greater visibility into project work, responsibilities, and decision-making because Plaintiff was experiencing ongoing difficulty obtaining necessary information and understanding her role on the NRT-Fraud Project.

52. Plaintiff took this initiative in an effort to improve communication, strengthen collaboration, and successfully perform her assigned duties.

53. Later that same day, Plaintiff scheduled a separate one-on-one meeting with Michael Jack to discuss project responsibilities, expectations, division of work, and communication processes because Plaintiff was attempting to establish a clearer understanding of how project work would be managed moving forward.

54. On or about January 7, 2025, Michael Jack instructed Plaintiff to lead a meeting involving technical resources despite not providing her with sufficient information regarding the subject matter or expectations for the meeting.

55. Plaintiff communicated that she did not have the information necessary to effectively lead the meeting and expressed concern that doing so could negatively impact both the project and meeting outcomes; however, the expectation that she proceed remained unchanged.

56. Prior to the meeting, Plaintiff independently attempted to obtain the information necessary to participate effectively after reviewing the meeting invitation and determining that additional project context would be required.

57. Plaintiff either obtained the information directly from Marley Hartzell (white female) or located the information herself within the meeting materials before the meeting began.

58. Despite Plaintiff's efforts to prepare, Michael Jack did not provide the necessary materials in advance of the meeting. Knowing they were required.

59. Instead, approximately halfway through the meeting, Michael Jack sent Plaintiff the materials and stated, "here you might need this."

60. Plaintiff informed Michael Jack that she had already obtained the information independently; however, Michael Jack did not acknowledge or respond to Plaintiff's statement.

61. Providing essential information only after the meeting had already begun undermined Plaintiff's ability to effectively participate in the discussion and created the appearance that Plaintiff was unprepared despite Plaintiff's independent efforts to prepare.

62. On multiple occasions, Michael Jack assigned Plaintiff tasks without providing the information, context, or visibility necessary to complete those tasks effectively.

63. Plaintiff's repeated requests for visibility into project work, staffing efforts, project planning activities, and responsibilities were either ignored or inadequately addressed.

64. These actions placed Plaintiff at a disadvantage compared to similarly situated white colleagues who received greater visibility into project activities, more complete information, and more effective support in performing their roles.'

## D. Differential Treatment During In-Person Collaboration Sessions

65. Between approximately January 6, 2025 and January 23, 2025, members of both the Fraud and Data teams worked together in person from a shared conference room within Defendant's Pittsburgh office.

66. It was prearranged that team members would work together in person during this period due to ongoing project delays, staffing shortages, and the need for increased collaboration on the NRT-Fraud Project.

67. Plaintiff informed team members that she would join the group after completing mandatory training sessions that had already been scheduled.

68. At that time, the NRT-Fraud Project remained understaffed and lacked key resources necessary to move the project forward effectively.

69. One of the missing resources was a Scrum Master, a role responsible for coordinating work, maintaining the work board, assisting engineering teams, and helping ensure project progress.

70. Prior to joining the conference room session, Plaintiff informed both Todd Ketterling (white male) and Justin Crowe (white male) that she had prior experience performing Scrum Master responsibilities and was willing to assist temporarily until Defendant hired a dedicated resource.

71. Plaintiff offered this assistance because project delays and lack of staffing had become a recurring topic of discussion among team members and leadership.

72. Plaintiff understood that Todd Ketterling directed her to discuss the matter with Justin Crowe, and Justin Crowe indicated that the possibility would be discussed further.

73. Later that day, after completing her scheduled training, Plaintiff joined Michael Jack (white male), Becky Walters (white female), Marley Hartzell (white female), and Shane (white male) in a smaller conference room where they were working together.

74. Upon entering the room, Plaintiff greeted everyone and observed that the words "Scrum Master" were written prominently on a whiteboard being used during the team's discussion.

75. Seeing the topic displayed on the board, Plaintiff informed the group of her previous conversation with Todd Ketterling and Justin Crowe regarding her willingness to

temporarily assist with Scrum Master responsibilities so that project work could begin moving forward while Defendant searched for a permanent resource.

76. Becky Walters, Marley Hartzell, and Shane responded positively and enthusiastically to Plaintiff's statement and expressed excitement about the possibility because it could help address one of the project's ongoing staffing deficiencies.

77. Michael Jack did not respond to Plaintiff's statement and appeared to ignore the conversation entirely.

78. Becky Walters then specifically directed Michael Jack's attention to Plaintiff's statement and asked words to the effect of, "Michael, did you hear that? Caitlin can help as Scrum Master and we can get work done."

79. Only after being prompted by Becky Walters did Michael Jack respond.

80. Michael Jack's response was minimal, dismissive, and lacked the enthusiasm displayed by the other team members. He responded with words to the effect of "oh" or a similarly brief acknowledgment.

81. Approximately five to ten minutes later, a group of white male employees entered the conference room, including Thomas Heckroth (white male), as well as Jordan Walters and another individual.

82. Upon their arrival, Michael Jack immediately became engaged, responsive, and conversational.

83. Plaintiff observed Michael Jack enthusiastically greet the individuals, engage them in discussion, and interact with them in a friendly and animated manner regarding work-related and personal topics.

84. The contrast between Michael Jack's interaction with Plaintiff and his interaction with white colleagues during the same meeting was noticeable and significant.

85. Plaintiff observed that Michael Jack regularly engaged white colleagues in a manner that was friendly, collaborative, and respectful, while often responding to Plaintiff in a dismissive, indifferent, or condescending manner.

86. This incident is one example of the differential treatment Plaintiff experienced compared to similarly situated white coworkers and is consistent with the broader pattern of conduct Plaintiff experienced throughout her employment.

## E. Interference With Work and Unequal Evaluation

88. As part of her responsibilities, Plaintiff was expected to participate in project status reporting, including identifying and documenting project risks and issues.

89. During Plaintiff's onboarding period, Marley Hartzell (white female) remained primarily responsible for portions of the project status report because Plaintiff was still completing required training and becoming familiar with the project.

90. Around January 2025, Thomas Heckroth (white male) was assigned to the NRT-Fraud Project as a Project Manager I after previously working for Defendant as a Project Administrator.

91. During the relevant period, Plaintiff worked alongside Becky Walters, Marley Hartzell, Shane, and Thomas Heckroth on the same NRT-Fraud Project and under the same project leadership structure.

92. Becky Walters served as Program Manager on the Data Team and supervised Marley Hartzell.

93. Marley Hartzell served as a Project Manager and was responsible for project reporting, project risks, stakeholder communications, and project coordination activities.

94. Thomas Heckroth was relatively new to project management responsibilities during the same period Plaintiff was assigned to the NRT-Fraud Project.

95. Plaintiff, Thomas Heckroth, Marley Hartzell, Becky Walters, Michael Jack, and Justin Crowe all participated in project meetings, project reporting activities, project status reviews, and project communications concerning the NRT-Fraud Project.

96. Plaintiff's work product, project risks, project updates, and project communications were reviewed by the same management personnel who reviewed the work of Thomas Heckroth, Marley Hartzell, and Becky Walters, including Michael Jack and Justin Crowe.

97. Despite participating in the same project reporting and review processes, Plaintiff's work was subjected to heightened scrutiny, editing, criticism, and interference that the work of her white colleagues was not subjected to.

98. Plaintiff observed that white colleagues routinely received constructive feedback, explanations, guidance, and collaborative support regarding project work, while Plaintiff frequently received criticism, dismissive responses, withheld information, revisions without explanation, or no explanation at all.

99. On or about January 23, 2025, a project meeting was attended by Plaintiff, Michael Jack (white male), Justin Crowe (white male), Marley Hartzell (white female), Becky Walters (white female), Shane (white male), and Thomas Heckroth (white male).

100. During the meeting, the team discussed the project status report, including project risks and issues that had occurred or were anticipated to occur during project execution.

101. Toward the end of the discussion, Marley Hartzell explained the portions of the status report she intended to complete, including preparation of a project risk.

102. During that discussion, either Michael Jack or Justin Crowe directed Plaintiff's attention to the topic and stated words to the effect of, "Caitlin, do you want to take a stab at writing a risk?"

103. Plaintiff agreed and indicated that she would prepare a proposed risk for submission.

104. Following Plaintiff's response, Marley Hartzell suggested that Thomas Heckroth also prepare and submit a proposed risk.

105. On January 23, 2025, at approximately 10:30 a.m., Plaintiff submitted her proposed project risk in the team Microsoft Teams chat.

106. At approximately 10:32 a.m., Thomas Heckroth submitted a proposed risk.

107. At approximately 10:33 a.m., Marley Hartzell submitted a proposed risk.

108. After reviewing the submissions, Marley Hartzell responded in the team chat that both submissions sounded good.

109. At approximately 10:39 a.m., Justin Crowe responded specifically to Plaintiff's submission.

110. Plaintiff's proposed risk identified concerns regarding project staffing and resource limitations that were affecting project execution and progress.

111. Rather than providing feedback, coaching, or explanation, Justin Crowe copied and pasted Plaintiff's submission, removed portions of Plaintiff's language, replaced certain wording, and revised portions of the text without identifying any deficiency in Plaintiff's original submission or explaining the purpose of the revisions.

112. Plaintiff observed that certain revisions removed portions of her original language, altered wording, and changed grammatical structure, but no explanation was provided regarding why the revisions were necessary.

113. At approximately 10:41 a.m., Michael Jack responded in the same Microsoft Teams conversation and stated that he would add a mitigation plan to the risk.

114. Prior to that point, Plaintiff had not been instructed that a mitigation plan was required, and neither Marley Hartzell nor any other team member had communicated that mitigation plans were expected as part of the task.

115. At approximately 10:47 a.m., Justin Crowe reposted the revised version of Plaintiff's risk and incorporated the mitigation language provided by Michael Jack.

116. At approximately 11:06 a.m., Plaintiff asked whether the other submitted risks would also require mitigation plans.

117. At approximately 11:13 a.m., Marley Hartzell responded that all risks would require mitigation plans.

118. Neither Justin Crowe nor Michael Jack provided any explanation regarding why Plaintiff's submission had been revised or why mitigation requirements had not been communicated when the assignment was initially given.

119. Prior to this incident, project status reports had been submitted by Becky Walters and Marley Hartzell.

120. On prior occasions, when Becky Walters submitted status reports, Justin Crowe provided professional feedback, answered questions, and supplied context regarding his comments and expectations.

121. Plaintiff did not receive comparable explanations, developmental feedback, coaching, or context regarding the revisions made to her work product.

122. Neither Justin Crowe nor Michael Jack identified any deficiency in Plaintiff's submission or provided guidance regarding how Plaintiff should approach similar assignments in the future.

123. By contrast, white coworkers participating in the same project reporting and review processes routinely received constructive feedback, explanations, and context regarding their work product.

124. The differing treatment of Plaintiff's submission compared to those of white coworkers contributed to Plaintiff being denied the same level of support, guidance, and professional development afforded to other members of the team.

125. The January 23, 2025 risk-reporting incident represented one of several instances in which Plaintiff's work was treated differently from the work of white colleagues despite being reviewed by the same managers and submitted through the same reporting process.

126. This incident was consistent with the broader pattern of conduct Plaintiff experienced throughout her employment, including being provided incomplete information, denied visibility into project activities, subjected to micromanagement, and receiving criticism or revisions without meaningful explanation.

## F. Supervisor Conduct and Escalation

127. Beginning in or around January 2025, Justin Crowe (white male), Plaintiff's direct supervisor, became more directly involved in Plaintiff's day-to-day work on the NRT-Fraud Project.

128. Prior to that time, Plaintiff generally interacted with Justin Crowe through periodic one-on-one meetings and project discussions.

129. As Justin Crowe became more involved in the project, Plaintiff observed a change in the manner in which he communicated with her and responded to concerns regarding project staffing, resources, project visibility, and work assignments.

130. Throughout Plaintiff's employment, Justin Crowe worked remotely from Erie, Pennsylvania and never met Plaintiff in person.

131. Despite never directly observing Plaintiff's work in person, Justin Crowe participated in evaluating Plaintiff's performance and ultimately made the decision to terminate Plaintiff's employment.

132. Despite working remotely, Justin Crowe repeatedly focused on Plaintiff's physical location within the office and her attendance in the office, despite the absence of any formal policy governing where Plaintiff was required to sit.

133. On or about December 2, 2024, shortly after a volunteer event attended by members of the Fraud organization, Plaintiff participated in a one-on-one meeting with Justin Crowe.

134. During that conversation, Justin Crowe asked whether Plaintiff had been into the office.

135. Plaintiff explained that she had inadvertently left her laptop at home following the volunteer event and, on the following day, experienced significant back pain related to a pre-existing diagnosis of sciatica.

136. Plaintiff nevertheless continued performing her work remotely during that period.

137. Plaintiff reported in person to the office shortly thereafter.

138. Throughout Plaintiff's employment, various team members made comments suggesting that they believed Plaintiff did not like them because she did not regularly sit near the team or attend lunch outings.

139. Plaintiff did not understand the basis for those comments because she maintained professional working relationships with coworkers and regularly participated in project meetings and discussions.

140. Defendant's Pittsburgh office utilized an open-seating arrangement, and employees were not assigned permanent desks or designated seating locations.

141. On multiple occasions, Plaintiff was unable to sit near members of the team because the area where they typically sat was already full by the time Plaintiff arrived at the office.

142. Plaintiff frequently selected the closest available seating elsewhere in the office, including quieter locations that allowed her to focus on onboarding activities, training materials, and project work.

143. Plaintiff was employed under a hybrid work arrangement and was generally required to work in the office two days per week.

144. Plaintiff was informed that many members of the Fraud team commonly worked in the office on Tuesdays and Wednesdays.

145. Plaintiff was never informed that any particular day was mandatory or that she was required to sit in a specific location within the office.

146. Despite the absence of any such requirement, Plaintiff's office attendance and seating location became recurring topics of discussion with Justin Crowe and other members of the Fraud team.

147. On January 13, 2025, Plaintiff participated in a scheduled one-on-one meeting with Justin Crowe.

148. During that meeting, Plaintiff requested information regarding her 30-, 60-, and 90-day performance expectations.

149. Plaintiff also raised concerns regarding lack of project resources, lack of assigned work, and inability to obtain visibility into project activities being managed by Michael Jack.

150. Plaintiff explained that project progress was being impacted by staffing shortages and that key project tasks could not proceed until additional resources were assigned.

151. Plaintiff informed Justin Crowe that an architect assigned to the project had indicated that he would be rolling off the project and that no additional work could be completed until another qualified resource was assigned.

152. Plaintiff further informed Justin Crowe that she was being asked to stay current on project resourcing efforts despite Michael Jack maintaining primary responsibility for those activities.

153. Rather than addressing Plaintiff's concerns regarding project staffing and resource limitations, Justin Crowe stated that there "had to be something to work on" and instructed Plaintiff to identify additional project work.

154. During the same meeting, Plaintiff asked how she could obtain greater visibility into work being performed by Michael Jack so that she could better understand project priorities, project responsibilities, and her own assignments.

155. In response, Justin Crowe asked Plaintiff where she sat while working in the office.

156. Plaintiff did not understand how her seating location related to her request for project visibility or access to information.

157. During the same meeting, Justin Crowe stated that one factor he would use to evaluate Plaintiff's progress was how well she integrated with the team and her knowledge of PNC's internal operations, despite Plaintiff having been employed by Defendant for only a short period of time.

158. Plaintiff also informed Justin Crowe that Michael Jack had previously provided project plans and assignments after substantial portions of the work had already been completed, limiting Plaintiff's ability to meaningfully contribute to project activities.

159. Plaintiff's concerns were not meaningfully addressed.

160. On January 14, 2025, Justin Crowe responded to a project status update submitted by Becky Walters in a Microsoft Teams discussion.

161. During that discussion, Justin Crowe stated that enterprise alignment remained a significant project issue because meaningful project work could not proceed without enterprise design decisions, even if additional resources were hired and assigned to the project.

162. Justin Crowe's statement was consistent with the concerns Plaintiff had raised during their January 13, 2025 meeting.

163. Despite acknowledging those limitations on January 14, 2025, Justin Crowe had informed Plaintiff the previous day that there "had to be something to work on."

164. Plaintiff reasonably believed she was being held responsible for project delays and lack of deliverables despite repeatedly informing Justin Crowe that the project lacked the resources, staffing, enterprise design decisions, and organizational support necessary for meaningful progress.

165. Justin Crowe's January 14 statements were consistent with Plaintiff's concerns and contradicted his prior criticism that additional work should nevertheless be identified and completed.

166. Plaintiff was not provided additional resources, staffing support, project visibility, or guidance following those discussions.

167. Plaintiff was nevertheless expected to produce work despite the same project limitations Justin Crowe later acknowledged were preventing meaningful project progress.

168. On January 24, 2025, Plaintiff participated in another scheduled one-on-one meeting with Justin Crowe while working from Defendant's Pittsburgh office.

169. Plaintiff attended the meeting from a conference room on the twenty-eighth floor of the building.

170. At the beginning of the meeting, Justin Crowe immediately asked Plaintiff, "Where you at?"

171. After Plaintiff explained that she was working from a conference room in the office, Justin Crowe asked what had prompted her to come into the office that day.

172. Plaintiff explained that she was complying with her in-office attendance requirements and had adjusted her schedule around medical appointments and a previously approved work-from-home day.

173. During the same meeting, Plaintiff again raised concerns regarding staffing shortages, project visibility, and lack of meaningful project work.

174. Justin Crowe acknowledged that staffing shortages were impacting project progress and stated that he had communicated similar concerns to leadership above him.

175. Despite acknowledging those issues, Justin Crowe continued to direct Plaintiff to produce additional work without resolving the underlying limitations Plaintiff had repeatedly identified.

176. During the same meeting, Justin Crowe instructed Plaintiff to begin coordinating activities related to a GAP analysis and directed her to work with project resources to move that work forward.

177. Plaintiff expressed concern that she could not effectively perform those responsibilities without visibility into work already being performed by Michael Jack and without alignment among project leadership.

178. In response, Justin Crowe stated words to the effect that project plans would not simply be "handed" to Plaintiff and emphasized that Plaintiff needed to "get in there."

179. Plaintiff clarified that she was not requesting that work be handed to her but was instead attempting to avoid duplication of effort, conflicting instructions, and confusion resulting from lack of visibility into project activities.

180. During the meeting, Plaintiff immediately contacted Michael Jack regarding whether any preparatory work had already been completed relating to the GAP analysis.

181. Michael Jack responded that no such work had been completed.

182. Michael Jack's response directly contradicted Justin Crowe's suggestion that preparatory work had likely already been performed.

183. Although Justin Crowe ultimately agreed that alignment among project participants was necessary, Plaintiff's concerns regarding visibility, communication, project ownership, and resource availability remained unresolved.

184. Throughout January 2025, Plaintiff repeatedly raised concerns regarding lack of project resources, lack of assigned work, lack of visibility, conflicting instructions, and inability to obtain information necessary to perform her job responsibilities.

185. These concerns were either dismissed, minimized, redirected back to Plaintiff, or left unresolved despite being repeatedly communicated to Justin Crowe.

186. Plaintiff was nevertheless expected to perform meaningful project work despite lacking access to information, resources, staffing support, and project visibility necessary to effectively perform her assigned responsibilities.

## G. Protected Activity

187. On January 24, 2025, Justin Crowe instructed Plaintiff to work with engineer Adam Wetcher to begin a Data Model Execution GAP Analysis and stated that Plaintiff would be responsible for coordinating meetings necessary to move the work forward.

188. Following those instructions, Plaintiff scheduled a meeting with Adam Wetcher for January 28, 2025, at approximately 4:30 p.m., based on Adam Wetcher's available calendar availability.

189. Plaintiff also invited Michael Jack as an optional attendee because Michael Jack served as Program Manager on the project and was directly involved in project planning and resource coordination.

190. On January 27, 2025, at approximately 10:13 a.m., Michael Jack emailed Plaintiff asking whether an earlier meeting time was available because he did not want the meeting to occur at the end of the day and "sort of waste Tuesday."

191. Plaintiff responded that Adam Wetcher's calendar was largely full and that she had selected the best available meeting time based on Adam Wetcher's availability.

192. Plaintiff copied Justin Crowe on the email because Plaintiff had learned that Adam Wetcher would soon be out of the office for an extended period and believed that his absence could create a risk to meeting the project's anticipated February 14, 2025 GAP Analysis deadline.

193. Michael Jack responded that Adam Wetcher's absence "underscores the point" and stated that Plaintiff needed to ensure the discussions occurred.

194. Plaintiff responded that she had scheduled the earliest practical meeting available and that Michael Jack was free to schedule additional meetings if another meeting time better aligned with his schedule.

195. The exchange reinforced Plaintiff's concerns regarding Michael Jack's pattern of micromanagement, lack of support, lack of alignment between management, lack of visibility into project work, and criticism despite Plaintiff following management's instructions and taking the actions she had been directed to take by Justin Crowe.

196. The exchange further contributed to Plaintiff's perception that she was being subjected to heightened scrutiny and criticism while being denied the information, support, and project visibility necessary to successfully perform her role.

197. That same day, January 27, 2025, at 2:53pm Plaintiff sent an email to Justin Crowe formally requesting reassignment from the NRT-Fraud Project.

198. In that email, Plaintiff stated, in relevant part, "I am respectfully requesting to be staffed on a different project that would provide a more structured and supportive learning experience."

199. Plaintiff explained that she was experiencing ongoing difficulties due to limited visibility into project work, lack of access to information necessary to complete assigned tasks, micromanagement, unclear expectations, and a working environment that was hindering her ability to contribute effectively.

200. Plaintiff further explained that reassignment would better align with her knowledge, skills, and professional experience while allowing her to continue contributing to Defendant's organization.

201. Plaintiff did not resign her employment.

202. Plaintiff did not state that she intended to leave Defendant's employment.

203. Plaintiff did not provide notice of resignation.

204. Rather, Plaintiff expressly requested reassignment to another project while remaining employed by Defendant.

205. On January 28, 2025, Justin Crowe informed Plaintiff via email that he was speaking with Human Resources and did not want Plaintiff to believe her concerns were being ignored.

206. On January 28, 2025, after receiving Justin's email, Plaintiff independently contacted Employee Relations seeking guidance regarding how to formally report her concerns.

207. Employee Relations informed Plaintiff that she was taking the correct course of action and her concerns should first be reported through her Line of Business, beginning with her direct supervisor, Justin Crowe, then escalated to her director, Todd Ketterling, if unresolved, and returned to Employee Relations if necessary.

208. Employee Relations further advised Plaintiff that if she believed she was experiencing discrimination, she could report those concerns directly to Employee Relations.

209. Plaintiff informed Employee Relations that she felt she may have been experiencing discrimination but was uncertain and requested examples or guidance.

210. Employee Relations informed Plaintiff that they could not provide examples and advised Plaintiff to report discrimination if she continued to believe it was occurring.

211. Plaintiff therefore continued attempting to follow Defendant's internal reporting procedures.

212. Plaintiff understood Justin Crowe's January 28, 2025 email stating that he was speaking with Human Resources to mean that he had received and reviewed her concerns regarding her working environment, lack of support, project visibility concerns, disparate treatment, and request for reassignment.

213. At the time Plaintiff contacted Employee Relations, her concerns included conduct by Justin Crowe himself. Plaintiff nevertheless attempted to follow the reporting structure provided by Employee Relations despite concerns regarding reporting alleged misconduct to the same individual whose conduct was being reported.

214. Plaintiff contacted Employee Relations on January 28, 2025, less than twenty-four hours after submitting her reassignment request and complaints to Justin Crowe.

215. Plaintiff's January 27, 2025 reassignment request, complaints regarding her working environment, complaints regarding lack of support, lack of project visibility, disparate treatment, and her January 28, 2025 communications with Employee Relations constituted protected activity under federal anti-discrimination and anti-retaliation laws.

216. Plaintiff reasonably believed she was following Defendant's internal reporting procedures and attempting to resolve her concerns through the channels identified by Defendant before escalating those concerns further.

## H. Retaliatory Termination

217. Plaintiff did not receive any substantive response regarding her concerns between January 27, 2025 and January 31, 2025.

218. Plaintiff's concerns regarding her working environment, lack of support, disparate treatment, lack of project visibility, micromanagement, and reassignment request remained unresolved.

219. On January 31, 2025, Plaintiff became ill during the workday and informed Justin Crowe that she was sick and requested that their scheduled one-on-one meeting be rescheduled.

220. Justin Crowe did not respond to Plaintiff's request.

221. As Plaintiff's condition worsened throughout the day, Plaintiff became unable to verbally communicate and canceled the meeting.

222. Immediately after Plaintiff canceled the meeting, Justin Crowe contacted Plaintiff and stated words to the effect of, "we still need to pull up today."

223. Plaintiff attended the meeting despite being unable to speak and was required to communicate primarily through typed responses.

224. During the meeting, Justin Crowe informed Plaintiff that a Human Resources representative named Charles had instructed him that the meeting needed to occur that day and could not be postponed.

225. Justin Crowe stated that he had a direction he needed to go in.

226. Justin Crowe further stated that he interpreted Plaintiff's January 27, 2025 request for reassignment as a resignation from the NRT-Fraud Project.

227. Plaintiff had never stated that she was resigning from the NRT-Fraud Project or from Defendant's employment.

228. Plaintiff's January 27, 2025 email expressly requested reassignment to another project within Defendant's organization and sought to continue her employment with Defendant in a more structured and supportive working environment.

229. Plaintiff did not communicate any intent to resign, separate from employment, or discontinue working for Defendant.

230. Plaintiff remained willing and able to continue working for Defendant and sought reassignment as a corrective measure to address the concerns she had repeatedly reported.

231. Justin Crowe informed Plaintiff that reassignment was not an option because moving Plaintiff to another project would "disrupt too many dominos."

232. Justin Crowe further stated that because Plaintiff remained within her ninety-day probationary period, Defendant had determined that she was not a fit and would be terminated.

233. Justin Crowe did not identify any specific performance deficiency, policy violation, disciplinary issue, or failure to meet expectations as the basis for this determination.

234. Justin Crowe stated that termination was his "only option."

235. Prior to termination, Plaintiff had not received any written warning, disciplinary action, corrective action, performance improvement plan, performance counseling, or documented performance deficiency.

236. Plaintiff had not been informed that her employment was in jeopardy.

237. At the time of termination, Plaintiff had been employed approximately eighty-two days into her ninety-day probationary period.

238. Plaintiff acknowledges that she remained within Defendant's probationary period at the time of termination.

239. Plaintiff is informed and believes that probationary status does not exempt an employer from compliance with federal anti-discrimination and anti-retaliation laws, nor does it permit termination for unlawful discriminatory or retaliatory reasons.

240. On January 24, 2025, Justin Crowe assigned Plaintiff responsibility for coordinating activities relating to the Data Model Execution GAP Analysis and communicated an anticipated completion deadline of approximately February 14, 2025.

241. Plaintiff was terminated on January 31, 2025, before she was given an opportunity to complete the assignment or demonstrate successful performance of the work.

242. Plaintiff's concerns regarding discrimination, disparate treatment, hostile working conditions, lack of support, lack of project visibility, micromanagement, and reassignment were not investigated or substantively addressed before termination.

243. Plaintiff was terminated three days after submitting her reassignment request and three days after contacting Employee Relations regarding discrimination concerns.

244. On the next business day, February 3, 2025, Plaintiff again contacted Employee Relations and reported retaliation, discrimination, and concerns regarding the manner in which her termination had been handled.

245. Plaintiff informed Employee Relations that Justin Crowe had failed to provide information regarding off-boarding procedures, return of company equipment, Human Resources contacts, benefits information, or other next steps associated with her termination.

246. Plaintiff further reported that when she attempted to obtain additional information, Justin Crowe instructed her to contact "whoever you got your prior information from" and ended the communication.

247. Employee Relations informed Plaintiff that an investigation would be conducted.

248. Employee Relations further informed Plaintiff that information regarding return of company equipment and off-boarding procedures should have been provided during the termination process.

249. Despite Employee Relations informing Plaintiff on February 3, 2025 that an investigation would be conducted, Plaintiff received no substantive follow-up regarding her complaints of discrimination, retaliation, or wrongful termination for more than one month.

250. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on February 3, 2025.

251. The Equal Employment Opportunity Commission issued Plaintiff a Notice of Right to Sue on March 10, 2025.

252. Plaintiff was not contacted by Employee Relations regarding her February 3, 2025 complaint of discrimination, retaliation, and wrongful termination until March 11, 2025.

253. Upon information and belief, March 11, 2025 was one day after the Equal Employment Opportunity Commission issued Plaintiff a Notice of Right to Sue.

254. The temporal proximity between Plaintiff's protected activity and her termination, together with the absence of prior discipline, lack of investigation, failure to address Plaintiff's complaints, Defendant's characterization of a reassignment request as a resignation, and Defendant's decision to terminate Plaintiff before she could complete the assignment she had recently been directed to perform, supports an inference of retaliation.


## I. PATTERN OF DISCRIMINATORY AND RETALIATORY CONDUCT

255. The conduct described herein was not isolated or accidental but reflected a continuing pattern of disparate treatment, exclusion, heightened scrutiny, micromanagement, and hostility directed toward Plaintiff throughout her employment.

256. Plaintiff was the only African American employee assigned to the NRT-Fraud Project team. The remaining project team members identified herein, including Michael Jack, Becky Walters, Marley Hartzell, Shane, Thomas Heckroth, Justin Crowe, and Todd Ketterling, were white.

257. Throughout Plaintiff's employment, Plaintiff was treated as less competent, less informed, and less deserving of professional support than white colleagues despite possessing substantial qualifications, certifications, and prior project management experience.

258. Plaintiff was repeatedly denied visibility into project work, staffing efforts, project planning activities, and decision-making processes necessary to perform her assigned responsibilities.

259. Plaintiff's work product was subjected to heightened scrutiny, revisions, criticism, rewriting, and interference without explanation, while white employees participating in the same project reporting and review processes received constructive feedback, context, guidance, support, or no criticism at all.

260. Plaintiff repeatedly sought guidance, volunteered to assist with project deficiencies, requested additional responsibilities, and attempted to contribute value to the project despite significant staffing shortages and organizational challenges.

261. Rather than receiving support, Plaintiff was subjected to micromanagement, exclusion from information, dismissive treatment, criticism, and hostility after following management's instructions.

262. Plaintiff formally reported concerns regarding her working environment, disparate treatment, lack of support, lack of project visibility, and management conduct on January 27, 2025.

263. Plaintiff contacted Employee Relations on January 28, 2025 and again on February 3, 2025 regarding discrimination, retaliation, and concerns surrounding her termination.

264. Defendant terminated Plaintiff on January 31, 2025 before any meaningful investigation into her complaints occurred.

265. Defendant terminated Plaintiff approximately eighty-two days into a ninety-day probationary period despite the absence of any documented performance deficiencies, disciplinary actions, corrective actions, performance improvement plans, or formal warnings.

266. The circumstances surrounding Plaintiff's treatment and termination support a reasonable inference that race was a motivating factor in Defendant's conduct and that Plaintiff's protected complaints contributed to Defendant's decision to terminate her employment.

267. The facts alleged herein demonstrate a continuing pattern of discriminatory treatment and retaliation culminating in Plaintiff's termination.

## IV. COUNT I – RACE DISCRIMINATION
## (Title VII of the Civil Rights Act of 1964)

268. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

269. Plaintiff is an African American woman and a member of a protected class under Title VII.

270. Plaintiff was qualified for the Project Manager II position based upon her education, certifications, professional experience, and prior work history.

271. Plaintiff suffered adverse employment actions, including disparate treatment, denial of support, denial of equal access to information, heightened scrutiny of her work, exclusion from project activities, and termination of employment.

272. Plaintiff was treated less favorably than white employees participating in the same project reporting, review, and management processes.

273. Plaintiff worked alongside Becky Walters, Marley Hartzell, and Thomas Heckroth on the same NRT-Fraud Project under the same project leadership structure, including Michael Jack and Justin Crowe.

274. Plaintiff, Becky Walters, Marley Hartzell, and Thomas Heckroth participated in the same project meetings, project reporting activities, status reviews, communications, and management review processes.

275. Despite participating in the same project reporting and management structure, Plaintiff's work was subjected to heightened scrutiny, criticism, rewriting, interference, and unequal evaluation that similarly situated white employees did not experience.

276. Plaintiff was denied information, visibility, support, and opportunities provided to white coworkers.

277. Plaintiff was the only African American employee assigned to the NRT-Fraud Project team.

278. The facts alleged herein support a plausible inference that Plaintiff's race was a motivating factor in Defendant's conduct.

279. Defendant's conduct violated Title VII of the Civil Rights Act of 1964, including the principles recognized in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Connelly v. Lane Construction Corp., 809 F.3d 780 (3d Cir. 2016).

## V. COUNT II – RETALIATION
### (Title VII of the Civil Rights Act of 1964)

280. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

281. Plaintiff engaged in protected activity when she reported concerns regarding discriminatory treatment, hostile working conditions, lack of support, management conduct, disparate treatment, and requested reassignment from the NRT-Fraud Project.

282. On January 27, 2025, Plaintiff formally requested reassignment from the NRT-Fraud Project after reporting concerns regarding Michael Jack's conduct, lack of project visibility, micromanagement, and the hostile work environment she was experiencing.

283. Plaintiff's reassignment request was not a resignation from Defendant's employment and did not express an intent to separate from employment with Defendant.

284. Rather, Plaintiff expressly requested continued employment on a different project within Defendant's organization.

285. On January 28, 2025, Plaintiff contacted Employee Relations and sought guidance regarding discrimination and reporting procedures.

286. Employee Relations instructed Plaintiff to continue reporting concerns through management channels and further advised Plaintiff to report discrimination concerns directly to Employee Relations if she continued to believe discrimination was occurring.

287. Plaintiff informed Employee Relations that she believed she was experiencing discrimination and sought guidance regarding the reporting process.

288. On January 31, 2025, only days after Plaintiff's complaints, Defendant terminated Plaintiff's employment.

289. Prior to termination, Plaintiff had not received any written warning, corrective action, disciplinary action, performance improvement plan, or documented indication that her employment was in jeopardy.

290. On January 24, 2025, Justin Crowe assigned Plaintiff responsibility for coordinating activities relating to a GAP Analysis deliverable with a February 14, 2025 deadline.

291. Plaintiff scheduled meetings and began taking steps to complete the assignment.

292. Defendant terminated Plaintiff approximately two weeks before the deadline and before Plaintiff had any meaningful opportunity to complete or be evaluated on the assignment.

293. During the termination meeting, Plaintiff was ill and unable to speak verbally and was required to communicate primarily through typed responses.

294. Despite Plaintiff's condition, Justin Crowe informed Plaintiff that Human Resources had instructed him to proceed with the termination that day.

295. Justin Crowe characterized Plaintiff's reassignment request as a resignation and stated that reassignment would disrupt "too many dominos."

296. Plaintiff's previously reported concerns regarding discrimination, disparate treatment, hostile working conditions, project visibility, and management conduct were not addressed prior to termination.

297. Defendant conducted no known investigation into Plaintiff's complaints before terminating her employment.

298. On February 3, 2025, Plaintiff again contacted Employee Relations and reported retaliation, discrimination, and concerns regarding the termination process.

299. Employee Relations informed Plaintiff that an investigation would be conducted.

300. Upon information and belief, Defendant terminated Plaintiff before conducting any meaningful investigation into the concerns Plaintiff reported regarding discrimination, disparate treatment, project visibility, management conduct, and reassignment.

301. Defendant's stated reasons for termination were inconsistent with Plaintiff's documented qualifications, the absence of prior discipline, the recent assignment of project responsibilities extending beyond Plaintiff's termination date, and Defendant's failure to address Plaintiff's complaints before terminating her employment.

302. The close temporal proximity between Plaintiff's protected activity and termination, together with the facts alleged herein, support a plausible inference of retaliation. See Moore v. City of Philadelphia, 461 F.3d 331 (3d Cir. 2006); LeBoon v. Lancaster Jewish Community Center Ass'n, 503 F.3d 217 (3d Cir. 2007).

303. Defendant's conduct constitutes unlawful retaliation under Title VII and Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006).

## VI. COUNT III – VIOLATION OF 42 U.S.C. § 1981

304. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

305. Section 1981 guarantees all persons within the United States the same right to make and enforce contracts as is enjoyed by white citizens.

306. Plaintiff had a contractual employment relationship with Defendant.

307. Defendant, acting through its managers, supervisors, and agents, subjected Plaintiff to disparate treatment under circumstances supporting an inference of race discrimination

308. Defendant denied Plaintiff equal access to information, project visibility, professional support, opportunities, and workplace benefits afforded to white employees.

309. Defendant subjected Plaintiff's work to heightened scrutiny, criticism, rewriting, interference, and unequal evaluation compared to white employees participating in the same project reporting and review processes.

310. Defendant's conduct impaired Plaintiff's ability to enjoy the benefits, privileges, terms, and conditions of employment on equal terms with white employees.

311. Plaintiff engaged in protected activity by reporting discrimination, disparate treatment, workplace concerns, and by seeking reassignment from what she reasonably believed to be a hostile and discriminatory work environment.

312. Shortly after engaging in protected activity, Plaintiff was terminated.

313. Retaliation claims are cognizable under 42 U.S.C. § 1981. See CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008).

314. Defendant's discriminatory and retaliatory conduct interfered with Plaintiff's right to make and enforce contracts as protected by 42 U.S.C. § 1981.

315. Plaintiff satisfied all administrative prerequisites applicable to her Title VII claims by filing a Charge of Discrimination with the Equal Employment Opportunity Commission and receiving a Notice of Right to Sue on March 10, 2025.

316. Plaintiff's claims under 42 U.S.C. § 1981 are independently actionable and do not require administrative exhaustion.

317. Defendant's conduct violated Plaintiff's rights under 42 U.S.C. § 1981.

318. As a direct and proximate result of Defendant's conduct, Plaintiff suffered damages as described herein.

## VII. DAMAGES

319. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer damages, including but not limited to:

a. Lost wages, salary, bonuses, retirement contributions, benefits, and other employment-related compensation;

b. Back pay from the date of termination through the date of judgment;

c. Front pay and future lost earnings resulting from Defendant's conduct;

d. Emotional distress, humiliation, anxiety, embarrassment, frustration, loss of sleep, emotional pain, suffering, inconvenience, and other non-economic injuries;

e. Damage to Plaintiff's professional reputation, career opportunities, and future earning capacity;

f. Costs associated with seeking replacement employment;

g. Punitive damages to the extent permitted by law due to Defendant's intentional, reckless, and/ or willful disregard of Plaintiff's federally protected rights;

h. Attorney's fees, litigation expenses, and costs to the extent recoverable by law;

i. Pre-judgment and post-judgment interest as permitted by law; and

j. Such other legal and equitable relief as the Court deems just and proper.

## VIII. RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant and award:

a. Back pay;

b. Front pay;

c. Compensatory damages;

d. Punitive damages;

e. Pre-judgment and post-judgment interest;

f. Costs of suit;

g. Attorney's fees to the extent recoverable by law; and

h. Such other legal and equitable relief as the Court deems just and proper.

## IX. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**Respectfully submitted,**

**Caitlin McCreary**

**Plaintiff, Pro Se**


401 W Commons Dr., Apt 208, Pittsburgh, PA 15212
412-320-1048
cmccreary12@gmail.com